## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION
## LEXINGTON

**CRIMINAL ACTION NO. 5:18-081**

**UNITED STATES OF AMERICA**                                     **PLAINTIFF**

**V.**                     **UNITED STATES'S SENTENCING MEMORANDUM**

**VLAD CALIN NISTOR**                                      **DEFENDANT**

\*   \*   \*   \*   \*   \*

The United States of America, through counsel, submits its position with respect to objections to the Presentence Investigation Report ("PSR") and the appropriate sentence for the Defendant, Vlad Calin NISTOR. The Defendant's objections to the PSR are numerous, but, as to the Guidelines calculation, amount to two disputes: an objection to the enhancement for being in the business of laundering funds and an objection to the failure to include a minor role reduction. However, the PSR accurately calculated the Defendant's Guidelines calculation. Accordingly, the Defendant's Total Offense Level is 25, and that the Defendant's Criminal History Category is I. [PSR at ¶¶ 33, 38.] The Defendant's applicable Guidelines range is thus 57 to 71 months' incarceration. [*Id*. at ¶ 53.]

Pursuant to the factors contained in 18 U.S.C. § 3553(a), and for the reasons set forth below, the United States believes that a sentence at the low end of the properly

adjusted Guidelines range is sufficient but not greater than necessary to achieve relevant sentencing goals.

## I.    Unresolved Objections to the Guidelines Calculations

### 1.    Business of Laundering Funds

The PSR enhanced NISTOR's Guidelines calculation by 4 levels pursuant to U.S.S.G. § 2S1.1(b)(2)(C), for the Defendant being in the business of laundering funds. [PSR at ¶ 26.]  The Defendant owned and operated Coinflux, a Romanian business that exchanged cryptocurrencies for fiat currencies.  His business facilitated the complex money laundering operation of the AOAF Network.  Thus, this enhancement squarely fits with the Defendant's business practices.

According to the commentary, when considering "the totality of the circumstances," the Court should look to six factors that indicate the defendant was in the business of laundering funds when determining whether this enhancement applies.  U.S.S.G. § 2B1.1 cmt. n. 4(B).  The Defendant did not make statements to an undercover government source or have any prior convictions, but the remaining four factors are all present in this case and counsel in favor of application of this enhancement to the Defendant's conduct.

First, NISTOR regularly engaged in the laundering of funds. *Id.* at cmt. n. 4(B)(i). The Defendant conceded that between October 30, 2015 and December 2016, a period of approximately 13 months, he laundered $1,850,000 in AOAF Network bitcoin on behalf of a single individual, Bogdan Popescu.  [R. 650: Nistor Plea Agreement at ¶ 3(d).] It is thus logical to infer that, given the amount of money exchanged, the Defendant has

2

admitted that his laundering of funds was regular. Second, even this concession, which certainly does not encompass all of NISTOR's services to the AOAF Network, also supports the conclusion that his money laundering activities endured over an extended period of time. *Id.* at cmt. n. 4(B)(ii).

Third, as testimony during the sentencing hearing will demonstrate if needed, the Defendant engaged in the laundering of funds from multiple sources. *Id.* at cmt. n. 4(B)(iii). This includes numerous indicted co-defendants, as well as other unindicted online-auction fraudsters. And fourth, in return for his laundering services just for Popescu, the Defendant earned approximately $91,200, a substantial amount of revenue for a single customer by any measure,[1] and certainly more so as compared with the average income of Romanians at the time. *Id.* at cmt. n. 4(B)(iv).

The Defendant's selective allocation of percentages and self-serving statements, such as that he was unaware that his business was at high-risk of money laundering until 2018 despite having exchanged vast sums of cryptocurrency for Popescu and then distributing fiat currency into numerous bank accounts using a variety of names on his behalf, should be ignored. [*Id.* at Page ID # 10440-41.] His business was designed to rake in profits from exchanging cryptocurrency for cash, without enacting any anti-money laundering or know your customer protocols, in other words, acting with deliberate ignorance.

---

[1] The $91,200 restitution figure in the Plea Agreement stems from the Defendant's earnings as a result of his money laundering activities with Bogdan Popescu from a period of March 2015 until December 2016, calculated in part based on NISTOR's own records indicating the percentage fees he charged Popescu. The United States will put on proof to support this at the sentencing hearing if needed.

3

NISTOR's business facilitated money laundering.  As with his co-defendant Rossen Iossifov, who also owned and operated a cryptocurrency exchange business called RG Coins that provided money laundering services for the AOAF Network, this 4-level enhancement properly applies.

## 2.  Minor Role Reduction

The PSR provided for no adjustment in the Guidelines calculation based on the Defendant's role.  [PSR at ¶ 28.]  The Defendant contends that he should have been awarded a two-point reduction for playing a minor role in this scheme under U.S.S.G. § 3B1.2.  [*Id*. at pp. 33.] This adjustment, however, is reserved for those with an especially low level of culpability, and the Defendant's conduct is not so blameless.

A minor role reduction may be applicable to someone who "is accountable under § 1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved."  U.S.S.G. § 3B1.2 cmt. n. A.  As explained by the USPO, "the loss amount attributable to the defendant is the same loss amount attributable to other co-Defendants."  [PSR at pp. 34.]  This is because NISTOR "was associated with the Alexandria Online Auction Fraud ("AOAF") Network."  [R. 650: Nistor Plea Agreement at ¶ 3(a).]  He exchanged bitcoin on behalf of numerous of his co-defendants, performing the final, necessary step in the money laundering chain that became so efficient over the course of this scheme.

As a money launderer, and a professional one at that, *see* Section I(1) above*,* the Defendant enabled Bogdan Popescu to obtain $1,850,000 in AOAF Network bitcoin over

the course of only 13 months. [*Id.* at ¶ 3(d).]  He exchanged bitcoin for numerous other online-auction fraudsters in addition to Popescu.  His business was designed as a facilitating force of the scheme; to consider his conduct minor greatly minimizes the important role he played in this money laundering scheme.

 In the same provision under the commentary that states that a minor role reduction may be applicable where the Defendant's personal gain is greatly outweighed by the loss amount, the Commentary provides the example of a "nominee owner[,] who received little personal gain relative to the loss amount." *Id.*  The Defendant is nowhere akin to a nominee owner.  He made significant sums in the form of exchange fees off of the exchanges with Popescu and the others.

To qualify for a minor role reduction, the Defendant must be "*substantially* less culpable than the average participant in the criminal activity." *Id.* In this money laundering scheme, the Defendant's culpability level places him in the middle band of participants (with obvious gradations within).  There are those with greater culpability – such as Popescu, and there are those with lesser culpability – such as Arvat and Dobrica.  And, there are those with similar culpability, such as co-Defendant Rossen Iossifov.  It should be noted that Iossifov, who performed a nearly identical role as the Defendant in the AOAF Network (although not as prolific as the Defendant), was not awarded a minor role reduction.

The criminal conduct at issue in this RICO conspiracy boils down to two principal components, the fraud and the money laundering.  The Defendant participated exclusively

in the latter component, but, in his role as a third-party money launderer, he understood the scope (the amount of money) and the structure (the wiring instructions, the use of mules, etc.) of the criminal activity, especially as it pertained to Popescu. Moreover, the breadth of his involvement in the RICO conspiracy was much greater than just the Popescu transactions to which he pleaded guilty. Further, the Defendant set out the rules for the cryptocurrency exchanges and exercised decision-making authority over those transactions. As the owner and operator of Coinflux, his discretion was plenary.

The Defendant performed an essential role in the criminal activity and is far from being *substantially* less culpable than the average participant in the money laundering scheme. The PSR correctly concludes that no adjustment should be applied for the Defendant's role in the scheme.

## II.   Sentencing Recommendation

The advisory Sentencing Guidelines range serves as the "starting point and initial benchmark" for the Court's sentencing analysis. *United States v. Bolds*, 511 F.3d 568, 579-80 (6th Cir. 2007) (citation omitted). Accordingly, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines Range." *United States v. King*, 553 F. App'x 518, 520 (6th Cir. 2014) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)). The Defendant's properly calculated, adjusted Guidelines range should be the rails guiding the Court's sentencing determination, as it adequately accounts for all relevant sentencing factors.

While the advisory Guidelines range serves as the "starting point and initial benchmark" for the Court's sentencing analysis, *Bolds*, 511 F.3d 579-80, the Court must also consider the factors set forth in 18 U.S.C. § 3553(a). These include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, and the need to avoid unwarranted sentencing disparities between similarly situated defendants. *See* 18 U.S.C. § 3553(a)(1)-(3), (6). When fashioning the appropriate sentence, the Court endeavors to find a punishment that is "sufficient, but not greater than necessary" to address these considerations. 18 U.S.C. § 3553(a).

In achieving this task, district courts consider the Sentencing Guidelines *together* with the statutory factors set forth in § 3553(a). *See United States v. Booker*, 543 U.S. 220, 246 (2005). This is because the Guidelines "reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). The Guidelines therefore "seek to embody the § 3553(a) considerations, both in principal and in practice." *United States v. Haj-Hamed*, 549 F.3d 1020, 1027 (6th Cir. 2008) (*quoting Rita*, 552 U.S. at 350).

Balancing the seriousness of the offense and other factors in 18 U.S.C. § 3553(a), the government recommends a sentence at the low end of the adjusted Guidelines range.

7

This sentence meets the objectives of 18 U.S.C. § 3553(a) in fashioning a sentence that is adequate, but not greater than necessary, as required by law.

### A. Nature and Circumstances of the Offense

While the PSR and numerous pretrial filings have explained the general nature of the scheme, there are several factors that underscore the sophistication and skill of the conspiracy.

The conspiracy as a whole was far-reaching, complex, and sophisticated.  It demonstrated a constant evolution, becoming more and more convincing to its victims, abusing victims' sympathies for the military, cloaking itself under the goodwill of legitimate businesses such as eBay, and fabricating invoices with language designed to make the victims feel secure in their purchase.

To evade detection, the conspiracy then engaged in a sophisticated money laundering scheme, relying heavily on the decentralized and anonymous nature of cryptocurrency. The money laundering scheme involved multiple layers of subterfuge to conceal fraud proceeds, once Romania-based defendants had successfully defrauded U.S.-based victims into sending money in exchange for what turned out to be nonexistent items, or would purchase proceeds of this fraud from other conspirators. The sequence is as follows:

- U.S.-based money mules would receive victim funds, either in their personal bank accounts, personal Post Office boxes, or from the Romania-based defendants' communications, who obtained debit/credit card codes from victims.
- The funds would then be converted by U.S.-based conspirators into digital currency.

8

- The proceeds, now in the form of digital currency, would then be transferred to the possession of conspirators in Romania.
- Money exchangers in Eastern Europe, such as NISTOR, would then convert the funds to local fiat currency without practicing strict or effective anti-money laundering or know-your-customer protocols.
- These same money exchangers would then deposit fiat currency into the accounts of friends, relatives, or low-level members of the conspiracy. These account holders would withdraw the funds and ultimately remit the proceeds to the original fraudsters.

NISTOR performed the services of the final two phases of this scheme, and he was critical to the success of the scheme. After all, what good is making all of this money if it exists in a form that cannot be used in the regular course of life? NISTOR, like so many others, may have started exchanging bitcoin as an enthusiast or speculator, but the allure of money, quick and anonymous, shifted his business practices to catering to the criminal underworld of the Romanian online auction fraud scammers. Hiding beneath a veneer of business legitimacy, NISTOR's conduct allowed the conspiracy's criminal acts to reach further, exploit more victims, and conceal higher volumes of proceeds. Without individuals like NISTOR to convert ill-gotten bitcoin into clean fiat currency, the enterprise would not have been able to realize the ultimate goals of the conspiracy—to enjoy the spoils of fraud and evade detection.

## B. History and Characteristics of the Defendant

The Defendant was born in Cluj-Napoca, Romania, to a family who met his basic needs and with whom he remains connected. [PSR at ¶¶ 43-44.] He has enjoyed a stable relationship with his fiancée for six years. [*Id.* at ¶ 45.] The Defendant was educated in Romania, and received a bachelor's degree from Brunel University (United Kingdom) in

2009. [*Id.* at ¶ 49.] He can speak three languages. [*Id.*] He reports regular, financial sector employment over his entire adult life, even managing a $500 million investment portfolio along with his supervisor. [*Id*. at ¶ 50.] His company, Coinflux, has bought and sold over $232,600,000 in cryptocurrencies and registered over 27,000 customers. [*Id.*] The Defendant comes before the Court as an otherwise law-abiding citizen. He has no criminal history. [*Id.* at ¶¶ 37-38.] The Defendant is smart, well-educated, and highly credentialed. He has enjoyed every advantage one could expect in his home country. The record lacks any evidence of financial difficulty, drug addiction, or any other reason to explain why the Defendant would commit the crime he did, other than greed.

Incredibly, the Defendant seems to suggest that his background made it such that he could not have imagined that the funds he exchanged would come from illegal activities. That this well-educated, highly credentialed in the financial sector individual could put forward such an incredible argument speaks to the Defendant's overall reckless disregard for the truth in committing the crime that he did. [R. 1268 at Page ID #10460.]

## C. The seriousness of the offense, promote respect for the law, and protect the public

Stunningly, the Defendant stated, in a record shared with the Court, "that there are no victims in Money Laundering offenses." [PSR: Letter from Counsel for Defendant, Page 3.] This utterly offensive disregard for the harm he has caused demonstrates the importance of a Guidelines sentence, to impress upon this Defendant the seriousness of the offense. Cybercrime is not a victimless crime simply because it is committed from behind a keyboard. Money laundering is not a victimless crime simply because the

10

perpetrator did not commit the underlying fraud. Rather, as this case makes clear, the extensive reach of the internet makes cybercrime, and the laundering of the proceeds of that crime, much more widespread and damaging to victims than traditional fraud schemes. A Guidelines sentence will reflect the seriousness of the offense, promote respect for the law, and protect the public.

### D. Deterrence

As a result of new technology, the barriers to entry for new cybercriminals have become extraordinarily low. With an internet connection and a working knowledge of English, even unsophisticated would-be criminals anywhere in the world can now perpetrate fraud on numerous U.S. victims, or launder the proceeds of such fraud. This makes deterrence is an important consideration, generally to all third-party money launderers.

A Guidelines sentence would deter similarly situated cryptocurrency exchangers who willfully turn a blind eye to proceeds of online crime. Cryptocurrency exchangers that knowingly mold their business practices into a tool for unlocking riches for the online criminal world are rarely brought to justice. Many cybercriminals, including members of the instant conspiracy, falsely believe their conduct will remain unchecked, as they hide beneath false claims of professional legitimacy. It is the anonymity of cryptocurrencies, along with the intentional separation of the illegal monetary conduct from the underlying fraud, that have encouraged a vast upsurge in the availability of online third-party money launderers, who facilitate devastating financial damage upon

11

untold victims located anywhere in the United States and elsewhere, all from the comforts of sitting at a computer. Third-party money launderers engage in this conduct, in part, because they believe it is doubtful that they will be caught and brought to justice. In cases where detection and apprehension occurs, the sentence must be commensurate to the increased need for deterrence.

In this case, the defendants' lack of regard or empathy for those victims pose a specific and ongoing threat to the public. The victims' own words here reflect the weight of the crime. For example, in his victim impact statement, N.M. recounts arriving to military duty in California when he fell victim to the conspiracy:

> I was 19 years old at the time and did not know anyone. I needed a car because California and Camp Pendleton are very big places, so I went online and started looking for inexpensive used vehicles. Being newly married and having a 1-year old little girl alone in Nebraska, money was not something we had very much of. While on the website Craigslist I found an ad for a black 2004 Chevy Impala SS listed for $1,500.00.

He goes on to recount a sympathetic narrative peddled by the conspiracy:

> I soon received an email from what was said was the mother of the vehicle's owner. "She" stated her son passed away and thus the reason for the low price on the vehicle. Sympathetic, I understood and believed why she would want to sell the car for such a low price.

N.M. then describes in detail the numerous steps required to remit payment. Afterwards, N.M. "received an email from what looked like eBay with a receipt for my purchase. Being overly excited about buying such a nice car for so little I overlooked the obvious signs of a scam." Incredibly, members of the conspiracy convinced N.M. to pay

12

an additional $1,500.00, and when N.M. learned from the real eBay that he was a victim

of fraud, N.M. did "the hardest part of the whole ordeal."

> I had to call my wife who was all alone with our baby girl and tell her that
> $3000.00 which was all of our savings was now gone. I felt I had failed as a
> father and as a husband, because I had just lost all of our money[.]

Victims such as N.M. demonstrate that the harms inflicted by the conspiracy are

particularly crushing for those already experiencing financial hardship, who are the most

likely to be seeking to purchase low-cost, used vehicles.

Other victim statements demonstrate how the conspiracy was particularly

successful at defrauding some of the most vulnerable members of our community, such

as senior citizens, including C.R.K., who has passed away. Her daughter and executrix,

S.R.G., detailed how the crime impacted not just C.R.K., but those close to C.R.K.

> These scammers not only cost mom $5000, but they robbed her of a normal
> daily life thereafter. The daily barrage of scam phone calls to mom robbed
> all of us of her remaining days because this consumed her life with worry.
> We considered changing her phone number that she had had for 71 years to
> try to stop it, however, she was diagnosed with dementia and we knew that
> she needed to hold onto that number in order for her to have a social life
> with friends and family.

Worried that C.R.K. would fall prey to additional fraud, S.R.G. and other family

members were forced to take steps to curtail C.R.K.'s independence. "My siblings and I

had to take mom's keys away because with every scam call, if we couldn't stop her, she

would run to Walmart or Kroger's to buy the cash cards to send, believing every word the

scammers had to say . . . cost[ing] mom her freedom to even run to the grocery store." In

addition to being more susceptible to fraud, senior citizens such as C.R.K. endure a

13

unique suffering after the fraud. S.R.G. recounts how her mother's dementia "worsen[ed] much faster than it would've," and how C.R.K. remained "in a mental loop of panic over these calls." Far from being victimless, the fraud perpetrated by this conspiracy and supported through money laundering efforts of individuals like NISTOR cause significant harm to victims such as N.M., C.R.K., and long-lasting incidental harm to their loved ones.

**E. Remaining Factors**

The United States does not believe there is a need to provide treatment to the Defendant, or to avoid unwarranted sentencing disparities.

**III.    Conclusion**

As this Court is aware, the Superseding Indictment charges twenty defendants. Seventeen had been convicted, by plea agreement or trial, for their roles in this offense. The Guidelines are the most consistent way to ensure that the sentences for these defendants, with varying levels of participation, are sentenced without unwarranted disparities.  As correctly concluded in the PSR, NISTOR's offense level is 25, and his criminal history category is I. This Court should sentence NISTOR to the low end of the properly adjusted Guidelines range.

Respectfully Submitted,

CARLTON S. SHIER, IV
ACTING UNITED STATES ATTORNEY

By:    s/ Kathryn Anderson_____

14

Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4885
Kathryn.Anderson@usdoj.gov

Kenneth R. Taylor
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
Ken.Taylor@usdoj.gov
(859)685-4874

Tim Flowers
Senior Trial Attorney
Computer Crime and Intellectual
Property Section
1301 New York Avenue NW, Suite 600
Washington, DC 20530
Timothy.Flowers@usdoj.gov
(202)353-0684

CERTIFICATE OF SERVICE

On September 14, 2021, I electronically filed this document through the ECF

system, which will send the notice of electronic filing to counsel of record:

Robert Webb
*Attorney for VLAD CALIN NISTOR*

s/ Kathryn M. Anderson
Assistant United States Attorney

15